In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 07-3648 & 08-2227

RUSH UNIVERSITY MEDICAL CENTER,

*Plaintiff-Appellant*,

*v.*

MICHAEL O. LEAVITT, Secretary of
Health and Human Services,

*Defendant-Appellee*.

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 C 1550—**Joan B. Gottschall**, *Judge*.

———————

ARGUED APRIL 16, 2008—DECIDED AUGUST 1, 2008

———————

Before EASTERBROOK, *Chief Judge*, and WOOD and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   Rush University Medical
Center believes that it has not received all of the Medi-
care payments to which it is entitled for fiscal year 1991.
After an unduly prolonged administrative process, the
Secretary of Health and Human Services resolved numer-
ous contested issues against the Medical Center. On
judicial review under 42 U.S.C. §1395oo(f)(1), the district

court made a decision mostly favorable to the Secretary's position. 2007 U.S. Dist. LEXIS 66244 (N.D. Ill. Sept. 4, 2007).

Unfortunately, it is impossible to tell from the judgment who won what. It reads:

> IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff, Rush University Medical Center's motion for summary judgment is granted in part and denied in part; the Defendant, Michael Leavitt's motion for summary judgment is granted in part and denied in part. Civil case terminated.

Unless the plaintiff loses outright, a judgment must provide the relief to which the winner is entitled. That motions have been granted is beside the point. See, e.g., *Waypoint Aviation Services Inc. v. Sandel Avionics, Inc.*, 469 F.3d 1071 (7th Cir. 2006); *Foremost Sales Promotions, Inc. v. Director, BATF*, 812 F.2d 1044 (7th Cir. 1987); *Reytblatt v. Denton*, 812 F.2d 1042 (7th Cir. 1987).

Despite Fed. R. Civ. P. 58(b)(2), which requires district judges to review and approve any judgment other than one implementing a jury verdict, awarding a sum certain, or denying all relief, this judgment was drafted and entered by a deputy clerk. For more than 20 years this court has been urging the district judges of this circuit to enter proper judgments. *Otis v. Chicago*, 29 F.3d 1159 (7th Cir. 1994) (en banc), and *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525 (7th Cir. 1988), are two examples among many. See also, e.g., *Properties Unlimited, Inc. v. Cendant Mobility Services*, 384 F.3d 917 (7th Cir. 2004); *Buck v. U.S. Digital Communications, Inc.*, 141 F.3d 710 (7th Cir. 1998).

Some district judges turn each decision over to a deputy clerk, who either fails to enter a judgment (many a case peters out with a "minute order" but nothing

resembling a Rule 58 judgment) or uses the last paragraph of the opinion as a template for drafting and entering a judgment without judicial input. When the disposition is simple, a clerk's interpretation is apt to be satisfactory. But when the disposition is complex, the clerk (who is not a lawyer) is at sea and disinclined to venture an independent interpretation. Then we get things like this document, which says that the judge has granted one or more motions ("in part"!) but does not even try to specify what matters: the *consequence* of the judicial ruling. Nothing but review by a judge, as Rule 58(b)(2) demands, will yield a satisfactory judgment when the outcome is complicated.

Sometimes it is easy to infer the disposition, and then the appeal may proceed despite technical shortcomings. See *Bankers Trust Co. v. Mallis*, 435 U.S. 381 (1978). But nothing is particularly easy about this litigation, which involves multiple issues. In the course of addressing more than a dozen disputes, the district judge concluded that the controversy could not be resolved fully without a remand to the agency. The agency had declined to compensate the Medical Center for the costs of resident physicians participating in some fellowship programs, which the agency thought had not been approved by the appropriate bodies. Concerned that some of the programs might have been approved, but that the Medical Center had been confused by the documentation requirements, the court directed the agency to give the Medical Center another opportunity to "complete Worksheet D-2" for some participants in some of the programs. Which participants and programs, and what are the agency's marching orders on remand? The document did not say.

At this court's urging, the parties returned to the district court and obtained a more informative judgment. A new

appeal has been filed. The second judgment, which the parties drafted for the district judge's signature, is itself barely adequate. It says that the agency must allow the Medical Center to submit documentation for "the costs of services furnished by residents in up to thirteen non-approved fellowship programs". More detail would have been appropriate, but this vagueness does not make the judgment non-final, though it would prevent any motion to hold the agency in contempt if it does not understand its duties the same way the Medical Center does.

The remand creates a second problem with appellate jurisdiction. Remand usually signifies that a decision is not final. Who wins, and how much, cannot be known until activity on remand has been finished. But the Supreme Court has held that a remand to an agency is final when the proceedings may end without further litigation—for, if the private claimant prevails, the agency cannot obtain judicial review of its own decision (even when that decision has been compelled by a judicial decision with which the agency disagrees). Unless the issues can be addressed in court while the agency deals with the remand, they might never be open to appellate review. That makes the district judge's decision effectively final. See *Forney v. Apfel*, 524 U.S. 266 (1998); *Sullivan v. Finkelstein*, 496 U.S. 617 (1990). *Forney* and *Finkelstein* arose from the Social Security program, but in *Edgewater Foundation v. Thompson*, 350 F.3d 694 (7th Cir. 2003), we concluded that they are equally applicable to medical providers' suits seeking reimbursement under the Medicare program. The sort of remand ordered by the district judge is one that might well conclude without a return to court, so the decision is appealable. Al-

though a decision that is "final" only because the agency may be unable to obtain review after its own action on remand might be thought to justify immediate review only at the agency's behest, *Forney* concluded that any decision final from the agency's perspective also is final from the private litigant's, and that principle controls here.

The first cluster of appellate issues arises from 42 U.S.C. §1395ww(d)(5)(F)(i)(I), which provides that hospitals serving a "significantly disproportionate number of low-income patients" receive additional Medicare payments. The statute and regulations treat persons eligible for care under the Medicaid program as "low-income patients" for this purpose. At the outset of this "disproportionate share" program, it was unclear how persons covered by states' general-assistance programs would be classified. Some hospitals (and some of the Medicare program's fiscal intermediaries) equated general-assistance patients to Medicaid patients; others did not. A regulation issued in December 1999, and effective January 1, 2000, provides that general-assistance patients do not count among the "low-income patients" for the purpose of this program. (We call it a regulation, though it is actually Program Memorandum A-99-62. The parties treat this document as if it had the status of a regulation; we do likewise without deciding whether that is correct.)

Periods before calendar year 2000 are covered by a grandfather clause (which the parties call the "Hold Harmless Rule"). Hospitals that classified general-assistance patients with Medicaid patients in cost reports filed before October 15, 1999, or took administrative appeals based on that theory, are entitled to the benefit of classification. Others are not. The manual instructs fiscal intermediaries:

> Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB [Provider Reimbursement Review Board] on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH ["disproportionate share hospital"] payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods . . . . Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues. You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

Emphasis in original. The idea is that any hospital that added a claim based on general-assistance patients must have been trying to take advantage of the grandfather treatment, which was first announced on October 15, 1999.

Only claims that predate the announcement of grandfather-clause treatment are allowed. On that date the Medical Center's appeal concerning its 1991 cost report was before the Provider Reimbursement Review Board (a component of the Department of Health and Human Services that reviews fiscal intermediaries' decisions). The Board, and later the Secretary, concluded that the Medical Center's papers on file on October 15, 1999, did not propose to treat general-assistance patients as Medicaid patients for the 1991 fiscal year, so the Medical Center could not take advantage of the grandfather clause. The district court held that the Secretary's decision is supported by substantial evidence.

The Medical Center equated general-assistance to Medicaid patients in its cost reports for 1989 and 1990 and received grandfather-clause treatment for those years. The current dispute concerns the cost report for 1991. The Medical Center did not treat general-assistance days the same as Medicaid days in that year's report or propose this treatment at any other time before October 15, 1999. In arguing that it should nonetheless receive extra compensation on account of its general-assistance patients in 1991, the Medical Center relies on a position paper filed in April 1998, challenging the fiscal intermediary's failure to "include all inpatient hospital days as directed by HCFA Ruling 97-2". (HCFA is an acronym for the Health Care Financing Administration, which administers the Medicare program for the Secretary. In 2001 it was renamed the Centers for Medicare and Medicaid Services.)

How was the Secretary to see in this language—a blanket demand to be paid everything that was due—any glimmer that the Medical Center proposed to equate general-assistance and Medicaid patients for the purpose of the

disproportionate-share program? The problem is not the omission of magic words but the fact that there were no synonyms for the right words, or even similes or metaphors. Indeed, a demand to be paid whatever is due misses the point that general-assistance patients differ from Medicaid patients for disproportionate-share payments. To receive grandfather treatment, the Medical Center had to assert before October 15, 1999, a particular approach that was *not* its due.

The parties have debated at length the inferences that might be drawn from the differences between the cost reports for 1989 and 1990 and the report for 1991. The exchange does not get us anywhere. The question is not what inferences we judges might draw, but whether substantial evidence (including the Secretary's inferences) supports the agency's conclusion that the Medical Center's elliptical "pay what you owe" language does not demonstrate a timely equation of general-assistance patients in the disproportionate-share claim. The Medical Center may be right to say that the Secretary could have ruled in its favor by giving the demand a generous reading. Agencies are not required to be generous with public funds, however—especially when the claim is not substantively correct and is supported only by a grandfather clause. An agency is entitled to guard against reading general language, with the benefit of hindsight, at taxpayers' expense. The Secretary's approach is supported by substantial evidence and not arbitrary or capricious.

A second group of issues concerns the Medical Center's entitlement to payments that underwrite some of the expense of conducting a graduate medical education program. Few details of this compensation system, see 42 U.S.C. §1395ww(a)(4), (d)(5), are material. What do

matter are the requirements that interns and residents who are not yet licensed by the state be working toward certification in certain specialties and be performing medical services in the hospital on a census day (for this fiscal year, September 4, 1990).

A hospital can claim reimbursement based on the number of interns in a teaching program "approved by the Council on Medical Education of the American Medical Association" (42 U.S.C. §1395x(b)(6)) and residents in an "approved medical residency training program" (42 U.S.C. §1395ww(h)(2)). The latter phrase means "a residency or other postgraduate medical training program participation in which may be counted toward certification in a specialty or subspecialty" (§1395ww(h)(5)(A)). The Secretary issued a regulation allowing any resident training "toward certification in a specialty listed in the *Directory of Residency Training Programs* published by the American Medical Association" to be counted, whether or not any group had approved the program. 42 C.F.R. (1990 ed.) §412.118(f)(1)(B). (This directory is today known as the *Graduate Medical Education Directory* or "Green Book". See 42 C.F.R. §412.105.) Arguably giving teaching hospitals a break beyond the statute's requirements, the regulation allows a resident to be counted even if the specialty or subspecialty has not received this formal recognition. That is possible when the program has been "approved by one of the national organizations listed in §405.522(a) of this chapter." 42 C.F.R. (1990 ed.) §413.86(b).

During fiscal year 1991 the Medical Center had residents in neuroradiology, spine surgery, and forensic psychiatry. None of these fields was recognized during fiscal 1991 in the *Directory of Residency Training Programs* as a medical specialty or subspecialty. None of the residents' programs

had been approved, before the end of the fiscal year, by "one of the national organizations listed in §405.522(a) of this chapter." But the Medical Center says that three residents should be counted anyway, because one program was approved only a month after the fiscal year's end, and the others had been approved by organizations not on the approved list (and were eventually approved by one of the listed organizations). Perhaps the Secretary could make exceptions on grounds such as these, but it is not arbitrary to enforce the rules as written. Medicare is a complex program; it would not be administrable if the Secretary had to bend or break rules whenever a judge thinks that something outside the rule is "close enough" to a rule's spirit. Arguments of this sort are addressed to the Secretary's discretion, not to a judge's sense of proportionality. Regulations are compromises and lack "spirits"—or so the Secretary may conclude without acting capriciously.

That the list of approving organizations had been amended "only" nine months before the start of the 1991 fiscal year does not change the regulation's effective date. Every rule has a beginning, and it is always possible to argue that the date should be postponed so that more conduct can be covered by older norms. The Administrative Procedure Act, and not a sense of rough justice, specifies how much notice an agency must give before changing a rule. The Medical Center does not say that this rule was amended with inadequate notice, so the Secretary was entitled to enforce it. (That the Secretary had authority to adopt this amplifying regulation cannot be doubted.)

Now we come to the census date. The Secretary concluded that three particular residents, though enrolled in

approved programs (or working toward listed specialties), were not receiving training in the Hospital on September 4, 1990. Actually what the Secretary concluded is that the Medical Center, which has the burden of both production and persuasion, had not demonstrated that these three residents were in the appropriate places at the required time. The Medical Center says that the Secretary did not prove that the residents were *not* in the Hospital, but that's not the Secretary's burden. A person claiming entitlement to a benefit is the one who must prove that claim by a preponderance of the evidence. See *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994).

The idea behind pinning down what residents were doing on a single day is that, with large numbers of persons involved, the assignments for any given day will closely mirror how many people the hospital assigns to particular tasks on average throughout the year—but it is much easier to determine where physicians were, and what doing, on a single day than on every day of the year. Unfortunately, it is not always possible to ascertain locations and tasks on even a single day, as this case shows. It isn't enough to be assigned to a hospital, or even in the hospital; it is essential to be in an eligible *part* of a hospital. Research areas, outpatient clinics, psychiatry units, and rehabilitation units are excluded. 42 C.F.R. (1990 ed.) §412.118(f). To know who was where, and when, the agency wants to see each hospital's formal rotation schedules for the census day.

The Medical Center did not submit rotation schedules for two of the residents in question. It says that these two were assigned to maternal/fetal medicine and so necessarily would have been in eligible areas on September 4, 1990. Yet the documentation that the Medical Center sub-

mitted did not show that these residents were assigned to work *at all* that day. Where they would have worked, had they worked, is beside the point. And the Secretary was entitled to doubt the adequacy of the evidence that the Medical Center eventually submitted, in the form of a letter from an administrator who joined the staff after the end of 1990. A belatedly submitted rotation schedule is one thing, a letter not based on the writer's personal knowledge quite another. That two residents had a specialty of maternal/fetal medicine is not enough to show that they were seeing patients rather than doing research on a particular day. A court would not have admitted this letter into evidence (it was hearsay and not a regularly kept business record); the Secretary might have relied on it but was not required to.

The third resident was shown on a rotation schedule as present in the hospital on the census day. The Medical Center says that this should have been enough. But the rotation schedule did not show what *part* of the hospital this resident was supposed to be working in, and as not all parts are eligible it did not carry the Medical Center's burden. The agency also suspected that this particular resident was actually working at a place other than the one on his schedule—a place ineligible for this special reimbursement—on September 4, 1990. We need not decide whether the suspicion was supported by substantial evidence; it is enough to say that the schedule's vagueness about location entitled the Secretary to reject the claim.

Finally, we come to a dispute about the Medical Center's capital costs. The value of the hospital itself goes into the compensation formula, as does the cost of interest on debt incurred to construct facilities that will be included in the

rate base. But the costs of other facilities—for example, hotels in which friends or relatives of patients may stay while visiting—do not go into the rate base, nor does interest paid on debt incurred to finance the construction of such facilities.

During 1987 the Medical Center developed a hotel, the "Inn at University Village", near the hospital. The Inn includes a restaurant and conference facilities as well as 114 rooms. Contemporaneously the Medical Center issued $10 million in bonds. The bonds are secured by the hospital and other medical facilities, not by the Inn, and the Medical Center contends that interest on these bonds should be treated as part of the cost of operating the hospital rather than the cost of building the Inn.

The Medical Center could not directly charge interest to the federal tab even if the debt had been incurred to run the hospital. But interest expense can be subtracted from investment income. The Inn operated at a loss, but Rush University has other producing investments, whose profits reduce Medicare reimbursement. The Medical Center wants to deduct the interest from these investment profits and so increase federal reimbursement. That is proper, however, only if the interest relates to the hospital rather than the hotel.

The Secretary concluded that it did not, for three principal reasons: The bonds were issued just when funds were needed to build the Inn; the capital raised by issuing the bonds ($10 million) is roughly equal to the Inn's construction cost ($9.8 million); and the Medical Center's own accountant attributed the interest to the Inn.

Although the Medical Center responds that this accounting treatment has since been "corrected," that the bonds'

indenture does not mention the Inn, and that the proceeds were deposited into the hospital's general operating account, the fact remains that money is fungible. It is six of one and half a dozen of the other whether the Medical Center incurs $10 million in debt to build a hotel, or instead incurs $10 million in debt to buy new MRI imagers and then uses $10 million out of its freed-up operating budget to build the hotel. In either event the $10 million, and the interest expense, could have been avoided had the hotel not been built. The Medical Center must cover the cost one way or the other, so even if a sheaf of resolutions by the Medical Center's board says that the money "really" will be devoted to diagnostic machines, or new carpets, or a renovated operating theater, it cannot be arbitrary or capricious for the Secretary to conclude that the hotel is the marginal outlay and should bear the interest expense. That the Medical Center's accountants originally had the same, sensible, understanding cinches matters.

AFFIRMED