**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# THE NINTH CIRCUIT

UNIVERSITY OF WASHINGTON
MEDICAL CENTER; PROVIDENCE
HOSPITAL EVERETT; PROVIDENCE
YAKIMA MEDICAL CENTER;
PROVIDENCE EVERETT MEDICAL
CENTER; PROVIDENCE CENTRALIA
HOSPITAL; PROVIDENCE ST PETER
HOSPITAL; STEVENS MEMORIAL
HOSPITAL; YAKIMA VALLEY
MEMORIAL HOSPITAL; HARRISON
MEDICAL CENTER; SOUTHWEST
WASHINGTON MEDICAL CENTER;
SACRED HEART MEDICAL CENTER;
KADLEC MEDICAL CENTER;
HARBORVIEW MEDICAL CENTER;
HOLY FAMILY HOSPITAL; GOOD
SAMARITAN COMMUNITY
HEALTHCARE; ST JOSEPH MEDICAL
CENTER; TACOMA GENERAL
HOSPITAL; ST FRANCIS HOSPITAL,
    *Plaintiffs-Appellants,*

v.

KATHLEEN SEBELIUS, Secretary of
the United States Department of
Health and Human Services,
    *Defendant-Appellee.*

No. 09-36044

D.C. No.
2:07-cv-00394-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

2289

Argued and Submitted
December 6, 2010—Seattle, Washington

Filed February 11, 2011

Before: Robert R. Beezer, Diarmuid F. O'Scannlain, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Beezer

**COUNSEL**

Teresa A. Sherman, Spokane, Washington; Jeffrey Lovitky, Washington, D.C., for the plaintiffs-appellants.

Peter A. Winn, Assistant United States Attorney, Seattle, Washington, for the defendant-appellee.

**OPINION**

BEEZER, Circuit Judge:

Plaintiffs-appellants, the University of Washington Medical Center and seventeen other hospitals from Washington State ("Hospitals"), appeal the district court's judgment upholding the Secretary of the Department of Health and Human Services' ("Secretary") exclusion of certain low-income populations from federal entitlement calculations. We affirm this judgment. Though the patients at issue in this case are mentioned in Washington's Medicaid plan, they are not "eligible for medical assistance" under that plan.

## BACKGROUND

### A.  Medicare and Medicaid

Medicare is a federally funded insurance program designed to cover older and disabled individuals. 42 U.S.C. § 1395 *et seq.*[1] Since the 1980s, Medicare has reimbursed hospitals primarily through the Prospective Payment System ("PPS") based upon what it would cost an efficient hospital to treat a patient with a given diagnosis. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 (1982) (codified at 42 U.S.C. § 1395ww (2006)). However, the Medicare statute adjusts the PPS reimbursement to account for hospital-specific factors that may make a provider's costs higher than average. 42 U.S.C. § 1395ww(d)(5).

The Medicare disproportionate share ("Medicare DSH") adjustment increases reimbursements to hospitals that serve a disproportionately high number of low-income Medicare patients. *Id.* § 1395ww(d)(5)(F).[2] The adjustment represents a percentage increase in a hospital's reimbursement computed by adding two fractions. The first, which is not at issue in this case, represents the percentage of time a hospital spends serving Medicare patients entitled to Supplemental Security Income. *Id.* § 1395ww(d)(5)(F)(vi)(I). The second represents:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days . . . which consist of patients who . . . were eligible for medical assistance under a State plan

---

[1]The laws governing both the Medicare and Medicaid programs are contained in the Social Security Act.

[2]For reasons such as lack of preventative care, indigent patients are generally more expensive to treat than the average patient. H.R. Rep. No. 99-241, pt. 1, at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594. Hospitals that treat large numbers of indigent patients are also likely to have higher overhead costs. For example, they may need to hire more staff such as social workers. *Id.*

approved under subchapter XIX of [the Social Security Act], but who were not entitled to benefits under [Medicare], and the denominator of which is the total number the hospital's patient days.

*Id.* § 1395ww(d)(5)(F)(vi)(II). "[A] State plan approved under [subchapter] XIX" is the State's "Medicaid" plan. 42 C.F.R. § 400.200. The result of this adjustment is that a hospital receives a higher reimbursement per *Medicare* patient as it treats more *Medicaid* patients.

Medicaid is a federal grant program that encourages states to provide certain medical services "on behalf of families with dependent children and [on behalf] of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. While the program is entirely optional, to receive Federal Financial Participation ("FFP") for the care of the indigent, a State must meet certain requirements. *See id.*; 42 C.F.R. § 400.203.

First, the State must submit a comprehensive plan to the Secretary for approval and must meet certain other procedural requirements. 42 U.S.C. § 1396a(b). Only after the State's plan is approved is the State eligible for FFP.

Second, the State must provide minimum coverage for "the categorically needy, generally those eligible for welfare; aged, blind, or disabled individuals who are qualified for social security disability benefits; and low-income pregnant women and children." *Spry v. Thompson*, 487 F.3d 1272, 1274 (9th Cir. 2007) (internal quotation marks and footnote omitted). It may also choose to provide such services for "the medically needy, individuals who are above the poverty line but would not be if they were not assisted with medical expenses." *Id.* (internal quotation marks and footnote omitted). The Secretary reimburses the State for the care of the categorically and

medically needy based on the "Federal medical assistance percentage." 42 U.S.C.. § 1396b(a)(1).

While the Federal medical assistance percentage is the primary form of Medicaid reimbursement, Medicaid (like Medicare) provides an adjustment for hospitals that serve a disproportionate number of low-income individuals ("Medicaid DSH"). However, the funding mechanism for the Medicaid DSH adjustment differs from the Medicare DSH adjustment. Rather than paying on a per patient basis, as in the Medicare DSH adjustment, the Medicaid statute allocates to each State a specific lump sum. *Id.* § 1396r-4(f). A State's Medicaid plan must define how hospitals receive Medicaid DSH reimbursements from that allotment. *Id.* § 1396r-4(a)(1).

A hospital may qualify for Medicaid DSH reimbursements in one of two ways. The first is if the hospital's "medicaid inpatient utilization rate . . . is at least one standard deviation above the mean medicaid inpatient utilization rate for hospitals receiving medicaid payments in the State." *Id.* § 1396r-4(b)(1)(A). A hospital's "medicaid inpatient utilization rate" is simply the percentage of a hospital's patients who are eligible for care under the State's Medicaid plan. *Id.* § 1396r-4(b)(2).

The second is if the hospital's "low-income utilization rate . . . exceeds 25 percent." *Id.* § 1396r-4(b)(1)(B). A hospital's low-income utilization rate is the percentage of a hospital's patients who (1) are eligible under the State Medicaid plan, (2) receive "cash subsidies . . . directly from State and local governments" for medical care, or (3) are charity patients. *Id.* § 1396r-4(b)(3).

Because a State must define how it will distribute Medicaid DSH funds, a State's Medicaid plan will often describe individuals who are neither categorically nor medically needy because they are either charity patients or eligible for direct cash subsidies from State or local governments. This case

centers on whether such individuals can be considered eligible for medical assistance under a State plan within the meaning of 42 U.S.C. § 1396ww(d)(5)(vi)(II) if a State uses its Medicaid DSH reimbursements to indirectly fund their care.

## B.    Washington's Medicaid Plan

Washington has chosen to extend hospital care beyond the categorically and medically needy to two other groups at issue in this case: the General Assistance-Unemployable ("GAU") and the Medically Indigent ("MI"). The GAU and MI populations have incomes similar to the categorically and medically needy. But the Hospitals admit that they are ineligible for traditional Medicaid because they are not aged, blind or disabled, and they do not have dependent children. *See* 42 U.S.C. § 1396-1.

It is undisputed that these programs began as state-funded initiatives. But facing budgetary constraints in 1991, Washington sought ways to alleviate the financial burden of covering these individuals. Because the GAU and MI populations did not qualify for traditional Medicaid, Washington amended its State Medicaid plan to indirectly fund their care using federal Medicaid DSH dollars.[3] In doing so, it placed the supervision of the GAU and MI programs under the purview of the Washington Department of Social and Health Services ("Department"). This agency uses a consolidated reimbursement system, creating much of the confusion in this case. But key differences remain between Medicaid's reimbursements for categorically and medically needy patients and Washington's program for the care of the GAU and MI populations.

---

[3]Although the Hospitals' intermediary stipulated certain facts about how federal funds paid for the MI and GAU programs early in the administrative process, the Secretary is not bound by these stipulations because she was not a party to the proceedings where these stipulations were made. *Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d 1065, 1074 (9th Cir. 2007). We look to the entire administrative record, most particularly the terms of the Washington State Medical Plan itself.

When a hospital treats a poor patient, it submits a claim to the Department. The Department then determines into which, if any, of the four categories (i.e., categorically needy, medically needy, GAU or MI) the particular patient falls. The Department then reimburses the hospital based upon a pre-established formula for the appropriate program. The Department determines the reimbursement for a GAU or MI patient by dividing Washington's Medicaid DSH allotment by the anticipated number of patients covered by these programs. That is, rather than distributing Medicaid DSH money to Medicaid DSH hospitals through a lump sum or at higher rates for their categorically or medically needy patients, Washington uses federal Medicaid DSH dollars to reimburse those hospitals at a much discounted rate for what would otherwise be state-funded MI or GAU patients.[4]

The Hospitals argue that because Medicaid dollars subsidize the care of these individuals, they should be considered Medicaid patients in the calculation of their Medicare DSH reimbursements.

## C.   Prior Proceedings

Medicare funds are distributed to providers through a system of fiscal intermediaries, usually insurance companies. 42 C.F.R. § 405.1801(b)(1). The Hospitals sought to include their GAU and MI patients in their Medicare DSH reimbursement calculations. The Hospitals' intermediary disagreed with the Hospitals' interpretation of the Medicare DSH statute and excluded the GAU and the MI populations for fiscal years 1994-2000. As a result, the Hospitals received a lower Medicare DSH reimbursement than they expected.

---

[4]That these individuals *would* otherwise be state-funded is confirmed by the fact that if a GAU or MI patient is treated by a hospital that does not qualify for Medicaid DSH reimbursement, the State reimburses the Hospital out of its own coffers.

The Hospitals administratively appealed the intermediary's decision to the Provider Reimbursement Review Board ("Board"), which hears disputes between providers and their intermediaries. 42 U.S.C. § 1395oo(a). The Board found in favor of the Hospitals. Ordinarily, this decision would have been final, but the Secretary (acting through the Administrator of the Centers for Medicare and Medicaid Services) exercised her prerogative to review the Board's decision. *Id.* § 1395oo(f)(1). The Secretary reversed the Board's decision because she concluded that Washington's GAU and MI patients were *not* "eligible for medical assistance" under Washington's Medicaid plan and therefore should not have been included in the Medicare DSH calculation.

The Hospitals sought judicial review of this decision in the district court. The district court granted summary judgment to the Secretary because the court found the Secretary's conclusion to be based upon a reasonable interpretation of the statute and supported by the record.

The Hospitals timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction to review the final decision of the Secretary under 42 U.S.C. § 1395oo(f)(1).[5] We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's grant of summary judgment

---

[5]We reject the Secretary's determination that the Board lacked jurisdiction over the Hospitals' claims for several of the cost-reporting periods at issue in this case. *See French Hosp. Med. Ctr. v. Shalala*, 89 F.3d 1411, 1420-22 (9th Cir. 1996) (holding that the Board has jurisdiction over issues forming the basis for a request for a reopening of a provider's cost report). Because the Board had jurisdiction over these claims, the district court also had jurisdiction over them. *See Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 850 (9th Cir. 1997).

de novo and without deference. *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091, 1095 (9th Cir. 2005).

The Social Security Act incorporates the standards of review established by the Administrative Procedure Act. 42 U.S.C. § 1395oo(f)(1). We review any factual findings by the Secretary for substantial evidence. 5 U.S.C. § 706(2)(A). We assess the Secretary's interpretation of the Medicare and Medicaid statutes under the two-step method laid out in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). We first decide whether "Congress has directly spoken to the precise question." *Id.* at 842. If so, the inquiry ends. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

## DISCUSSION

**[1]** This case turns on the meaning of the phrase "eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Hospitals assert that because the GAU and MI populations are mentioned in Washington's Medicaid plan and indirectly benefit from federal Medicaid dollars, they are "eligible for medical assistance" under Washington's plan. Because we conclude that "eligible for medical assistance under a State plan approved under subchapter XIX" is unambiguously limited to those eligible for traditional Medicaid, we reject this interpretation under *Chevron*'s first step.

**[2]** As we have previously stated, a person is "eligible for medical assistance" if he or she is "capable of receiving" medical assistance. *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1264 (9th Cir. 1996) (internal quotation marks omitted). Any individual who is capable of receiving medical assistance must be included in a hospital's Medicare DSH percentage whether or not the State pays for

the patient's medical care. *Id.* at 1265. Because the inquiry turns not on the payment of a patient's medical bills but on eligibility for "medical assistance," we must understand what that term means under the Social Security Act.

Medicare does not define "medical assistance," but we may look to its definition under Medicaid. Nothing in the context of the Social Security Act overcomes the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932). Indeed, given that the Medicare DSH adjustment counts patients who are eligible for "medical assistance" under subchapter XIX of the Social Security Act, it is hard to imagine looking anywhere other than subchapter XIX for a definition of this critical term. *Cf. Phoenix Mem'l Hosp. v. Sebelius,* 622 F.3d 1219, 1226 (9th Cir. 2010).

**[3]** As we have recently said, under Medicaid, "medical assistance" does not include just "any type of medical assistance under a [S]tate plan." *Id.* at 1225; *accord Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 179-80 (D.C. Cir. 2008); *Cooper Univ. Hosp. v. Sebelius*, 686 F. Supp. 2d 483, 494 (D.N.J. 2009) *aff'd___* F.3d___, 2011 WL 117625 (3rd Cir. Jan. 14, 2011). Rather, "medical assistance" is a statutory term of art that "means payment of part or all of the cost of [certain enumerated categories of] care and services . . . for individuals, and, with respect to physicians' or dentists' services, at the option of the State, to individuals" who meet statutory eligibility criteria. 42 U.S.C. § 1396d(a); *Phoenix Mem'l Hosp.*, 622 F.3d at 1226.

**[4]** Thus, the definition of "medical assistance" has four key elements: (1) federal funds; (2) to be spent in "payment of part or all of the cost"; (3) of certain services; (4) for or to "[p]atients meeting the statutory requirements for Medicaid,"[6] *Legacy Emanuel Hosp. & Health Ctr.*, 97 F.3d at 1266.

---

[6]As the Hospitals' counsel asserted at oral argument, the Secretary may waive certain of these requirements and allow States to cover other popu-

**[5]** Even though federal Medicaid money indirectly subsidized the medical treatment received by Washington's GAU and MI populations, their care still does not meet this definition of "medical assistance."

**[6]** First, substantial evidence supports the Secretary's finding that the GAU and MI populations do not fit within the enumerated classes of people under section 1396d(a). In large part, these classes share the characteristics of the categorically or medically needy. *Compare* 42 U.S.C. § 1396a(10) *with id.* § 1396d(a)(i)-(v), (vii)-(viii). The Hospital's own witnesses admitted during the administrative review process that the GAU and MI programs covered those who are not within these categories. Indeed, the Hospitals concede on appeal that the "MI and GAU programs cover low-income persons who do not meet the categorical or status requirements for the Categorically Needy and Medically Needy programs, and therefore are considered ineligible for 'Medicaid.'" Appellants' Opening Br. at 17. Because the Hospitals' GAU and MI patients did not fit within the statutory classes of people, the patients were not capable of receiving medical assistance as defined by Medicaid. *Cf. Adena Reg'l Med. Ctr.*, 527 F.3d at 180.

**[7]** Second, the federal government was not spending its funds for the GAU and MI populations' care. The Hospitals assert that because Washington uses its Medicaid DSH allotment to reimburse the Hospitals for the care of the GAU and MI populations on a per patient basis, this requirement is sat-

---

lations in their Medicaid plans. But this authority comes not under the Medicaid DSH provision, 42 U.S.C. § 1396-4 (distinguishing explicitly between state- and federally-funded patient populations). Rather, this authority derives from 42 U.S.C. § 1315(a). Because the Secretary has not granted Washington a waiver for its GAU and MI populations under section 1315, this provision does not operate to make these patients "eligible for medical assistance" under subchapter XIX of the Social Security Act. *See Phoenix Mem'l Hosp.*, 622 F.3d at 1226-27.

isfied. But adopting this interpretation would ignore the different funding mechanisms Congress created within the Social Security Act for the Medicare and Medicaid DSH adjustments.

The federal government makes matching Medicaid payments to Washington based upon the federal medical assistance percentage for the care of the categorically or medically needy. 42 U.S.C. § 1396b. The more categorically or medically needy patients that a State serves, the more reimbursement it gets. Therefore, it is easy to see how the federal government is paying *for their care*.

[8] By contrast, the Medicaid DSH adjustment consists of a State-specific statutory allotment that increases only with inflation. *Id.* § 1396r-4(f). This lump sum is not based upon or keyed to the number of patients served. *Id.* Indeed, States are required to use it "to take into account the situation of *hospitals* which serve a disproportionate number of low income patients with special needs." *Id.* § 1396r-4(a)(1) (emphasis added). Regardless of how the State chooses to distribute it to DSH hospitals, this money is *not* being paid on behalf of any specific individual for any specific service.[7]

[9] Finally, adopting the Hospitals' interpretation of the Medicare DSH statute would also ignore key differences between the Medicare and Medicaid DSH statutes themselves. While both provisions use proxies to measure how many of a hospital's patients are low-income individuals, the proxies are different. The Medicare DSH adjustment uses as its proxy only those patients who are eligible for federal assistance

---

[7]The experience of hospitals that are not entitled to DSH reimbursements but that serve individual MI or GAU patients confirms this. In such circumstances, the federal government pays *nothing* for their care. In addition, because Washington only receives a certain amount under the DSH program, the State caps how much of that lump sum it will distribute to any given hospital under the GAU or MI programs. No such cap exists for traditional Medicaid because it is a true matching program.

either from the Supplemental Security Income program or "under a plan approved under subchapter XIX." *Id.* § 1395ww(d)(5)(F)(vi)(II). The Medicaid DSH proxy considers *either* those patients who are "eligible for medical assistance under a State [subchapter XIX] plan" *or* who qualify under the statute's definition of "low-income." *Id.* § 1396r-4(b)(2)-(3). Adopting the Hospitals' interpretation of the Medicare DSH statute would render this difference meaningless.

**[10]** For these reasons, we conclude that Washington's GAU and MI patients were not eligible for medical assistance under Washington's Medicaid plan. They were therefore properly excluded from the calculation of the Hospitals' Medicare reimbursements.

**AFFIRMED.**