*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ADVENTIST HEALTH SYSTEM/SUNBELT, INC.,
                    *Plaintiff-Appellant*,

      *v.*

No. 11-5990

KATHLEEN SEBELIUS, Secretary, United
States Department of Health and Human
Services,

                 *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:10-cv-189—J. Ronnie Greer, District Judge.

Argued: July 19, 2012

Decided and Filed:  April 22, 2013

Before:  SUTTON and GRIFFIN Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Stephanie A. Webster, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellant.  August E. Flentje, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Stephanie A. Webster, Patricia A. Millett, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., Hyland Hunt, AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas, for Appellant.  August E. Flentje, Anthony J. Steinmeyer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

—————————

## OPINION

—————————

HOOD, District Judge.  Plaintiff-Appellant Adventist Health System/Sunbelt, Inc. ("Adventist") asks us to review the Secretary's interpretation of the Medicaid fraction provision in the disproportionate share hospital (DSH) statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (1994), *amended by* Deficit Reduction Act of 2005 ("DRA"), Pub. L. 109-171 (2006), which was in effect during the period of which Plaintiff complains, from 1995 through early 2000.  Specifically, we are asked whether the DSH statute, prior to amendment by the DRA, required the Secretary to include individuals in the DSH adjustment calculation if they received medical services as waiver-expansion population patients under a demonstration project approved pursuant to 42 U.S.C. § 1315(a) (1994), *amended by* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193 (1996).

We conclude that the DSH statute, as it read during the relevant period and prior to its amendment by the DRA, did not require the Secretary to regard individuals who received medical services as waiver-expansion population patients under a demonstration project approved pursuant to 42 U.S.C. § 1315(a)(2)(A) as persons "eligible for medical assistance under a State plan approved under Subchapter XIX." *Id.* § 1395ww(d)(5)(F)(vi)(II) (1994).  In fact, Congress did not directly address the precise question at issue before us in the DSH statute, as it stood at the time, and it was ambiguous in this regard.  Finally, having considered the matter, we conclude that the Secretary's decision to omit waiver-expansion population patients from the DSH adjustment calculation during the relevant period was based on a permissible construction of the statute.  Accordingly and as explained more fully below, we **AFFIRM** the decision of the district court.

# I.

## A.      Medicare and Medicaid Statutes

At all times relevant to this appeal, the federal government reimbursed hospitals for certain medical services provided to eligible individuals through the Medicare program under the auspices of Subchapter XVIII of the Social Security Act.  42 U.S.C. §1395-1395ggg (1994 and 2000).  Under Subchapter XIX of the Act, the Medicaid program, the federal government provided funds to states to offset some of the expense of furnishing medical services to low-income persons.  *Id.* §§ 1396–1396v (1994 and 2000); 42 C.F.R. § 430 (1995–2000).  A state was required to submit a plan for approval by the Secretary of Health and Human Services in order to receive this federal assistance,  42 U.S.C. § 1396a, and received federal matching funds to cover the costs of medical assistance for the needy if it submitted a Medicaid plan that satisfied federal requirements.  *See* 42 U.S.C. § 1396a(a) (1994).

Federal law mandated that the state Medicaid plan cover medical assistance for specific populations, but the joint state-federal program left the states the option of covering additional groups.  *See* 42 U.S.C. § 1396a(a)(10)(A)(i)–(ii).  Additionally, under Subchapter XI of the Social Security Act, a state could seek to expand the coverage of its Medicaid program by applying for a waiver of Medicaid requirements to operate an "experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid.  42 U.S.C. § 1315.  Section 1315 authorized the Secretary to waive, among other things, statutory eligibility limitations on the payment of "medical assistance" to individuals under the Medicaid program so that the "costs of such [State plan] project which would not otherwise be included as expenditures under. . . [the statutory provisions] shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under such subchapter, . . . as may be appropriate . . ." 42 U.S.C. § 1315(a)(2)(A); 42 U.S.C. § 1396d(a) ("medical assistance" defined as payment for enumerated health care services including inpatient care); 42 U.S.C.

§ 1396b(a)(1) (limiting state expenditure of federal matching funds to "medical assistance under the State plan").

Reimbursement for treatment was closely circumscribed.  As part of the program, hospitals were paid "a prospectively determined amount per discharge" for inpatient care provided to patients based on the patient's diagnosis at the time of discharge.  *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994) (citing 42 U.S.C. § 1395ww).  In light of the fact that hospitals serving a large number of low-income patients generally incurred higher costs than the flat diagnosis-based payment rates reflect, hospitals that treated a disproportionate share of low-income patients could apply for an upward adjustment to the standard prospectively determined amount per discharge.  42 U.S.C. § 1395ww(d)(5)(F); H.R. Rep. No. 99-241, pt. 1, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594 (citing the fact that low income patients' care is often more costly because "low-income Medicare patients are in poorer health within a given [diagnosis-related group] (that is, they are more severely ill than average), tend to have more complications, secondary diagnoses and fewer alternatives for out of hospital convalescence than other patients" and additional special staffing including social workers, translators, and nutrition/health education workers are needed); *see also Jewish Hosp.*, 19 F.3d at 272 ("Congress sought to adjust the Medicare [prospective payment system] to recognize the higher costs incurred by hospitals that serve a large number of low income patients.").   This adjustment, known as the "disproportionate share hospital" or "DSH" adjustment, was based on how much care a hospital provides to indigent patients relative to its total patient volume.   *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).

The Medicare DSH adjustment was calculated at all relevant times, in part, based on the amount of care a hospital provided to Medicaid patients, i.e., the "Medicaid fraction," which recognizes that the more Medicaid eligible patients a hospital treats, the greater its share of low-income patients. *Cookeville Reg. Med. Ctr. v. Leavitt*, 531 F.3d 844, 846 (D.C. Cir. 2008) (construing relevant statutes in context of TennCare program); *Jewish Hosp.*, 19 F.3d at 275.  The numerator was  "the number of the hospital's patient

days . . . which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The denominator was "the total number of the hospital's patient days." *Id.*

### B.    TennCare

In 1993, Tennessee applied for a statewide waiver of several Medicaid requirements to establish a demonstration project known as TennCare. Tennessee sought and received approval to cover two groups of citizens even if they were not otherwise eligible for the state's Medicaid program—uninsured and uninsurable individuals. [Waiver Approval Letter, Nov. 18, 1993, App'x, at A7–A8.] Pursuant to the authorization to do so under Subchapter XI, the Secretary waived Medicaid restrictions imposed by 42 U.S.C. § 1396a and specified that "expenditures made by the State" for those individuals "shall, for the period of this project, be regarded as expenditures under the State's [Subchapter] XIX plan" and reimbursed accordingly. [*Id.* at A8.] Once the project was approved, hospitals in Tennessee provided care to the covered populations, including both the traditional Medicaid population and the "expansion waiver" population, and received reimbursement for care provided under the umbrella of TennCare, although procedures to distinguish between the two populations were to be maintained. [GAO Report on TennCare, Sept. 1, 1995, App'x at A23–A24; Health Care Financing Administration Special Terms and Conditions, App'x at A16.]

### C.    Pre-2000 Discrepancies in Calculating Adjustment by Fiscal Intermediaries and Legislation With Respect Thereto

While there was no distinction between the two groups when it came to the amount and form of reimbursement, the two groups were treated differently for purposes of the DSH adjustment calculation in some jurisdictions. A fiscal intermediary approved for a given state received and processed requests for reimbursement, including requests for DSH adjustment payments. *See* 42 U.S.C. § 1395h (1994), *amended by* Health Insurance Portability and Accountability Act, Pub. L. 104-191 (1996) and Balanced Budget Act, Pub. L. 105-33 (1997); 42 C.F.R. §§ 405.1803-405.1811 (1995–2000). As

it happened, for a period in the 1990s through part of the year 2000, fiscal intermediaries in some, but not all, states allowed hospitals to include expansion waiver population patients in the Medicare DSH adjustment. *See* Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation: Change in the Treatment of Certain Medicaid Patient Days in States With 1115 Expansion Waivers, 65 Fed. Reg. 3136, 3137 (Jan. 20, 2000) ("Interim Final Rule") ("because our prior guidance on certain aspects of our Medicare DSH policy was insufficiently clear, many hospitals in States with approved section 1115 expansion waivers have been receiving Medicare DSH payments reflecting the inclusion of expansion population patient days"); [*see also* Letter from Health Care Financing Administration, Oct. 15, 1999, App'x at A45.]  Others, including fiscal intermediaries for hospitals in Tennessee, did not. [*See* Memorandum, Disproportionate Share Hospital Payment Medicaid Days Under Tenncare, Oct. 1, 1996, Addendum to Appellee's Brief at 57.]  Because the expansion waiver population was not included in the DSH adjustment calculations in Tennessee, hospitals eligible for DSH adjustments received lower rates of reimbursement than if the population had been included in the calculation by the fiscal intermediary.

In light of these discrepancies between the practices of fiscal intermediaries in the various states, the Secretary stated in a December 1999 Program Memorandum that it was necessary "to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy" and that "eligibility for medical assistance under an approved [Subchapter] XIX State plan, not medical assistance under a State-only program or other program[,]" such as that obtained by those individuals included in the Tenncare expansion waiver population, was required to include a population in the DSH adjustment formula. [Program Memorandum A-99-62, App'x at A46–A47.]  The Secretary described any earlier inclusion of "ineligible waiver or demonstration population days" in the Medicaid fraction by fiscal intermediaries as "erroneous." [*Id.* at A48.]

However, the Secretary then issued an Interim Final Rule in January 2000, which provided that eligibility waiver patients were to be included as individuals "eligible for

medical assistance" under Medicaid for the purposes of the DSH adjustment calculation because "the [waiver] statute allows for the expansion populations to be treated as Medicaid beneficiaries" and because including the waiver population in the DSH adjustment was "fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid." 65 Fed. Reg. at 3136–37. The Secretary decided to include expansion waiver patients in the DSH formula, a decision that was ultimately made part of the final rule on the issue. *Id.* at 3139; *see also* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47,054, 47,086–87 (Aug. 1, 2000).

Five years passed, and Congress enacted the DRA, amending the Medicare DSH statute to directly address how patient days for expansion waiver patients should be counted in the DSH adjustment calculation. *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006). Amended 42 U.S.C. § 1395ww(d)(5)(F)(vi) then provided that:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI of this chapter.

The Act also "ratified" the Secretary's January 2000 Interim Final Rule that adopted the prospective (from January 20, 2000) policy of including expansion waiver patient days in the Medicare DSH adjustment. Pub. L. No. 109-171, § 5002(b)(1) (citing 65 Fed. Reg. 3136, *et seq.*).

## D.    The Present Dispute

Adventist is a not-for-profit network of hospitals in the Midwest and Southeast. Two of the network's hospitals in Tennessee provided over 1,200 patient days of

inpatient care to TennCare expansion waiver patients who received medical assistance during the late 1990s and very early 2000. The fiscal intermediary charged with evaluating claims for Medicare reimbursement did not include those days in calculating the hospitals' Medicare DSH adjustment for cost years 1995 to 2000, reducing—according to Plaintiff—the payments received by approximately $6 million.

Adventist appealed that exclusion to the Secretary's Provider Reimbursement Review Board, which upheld the exclusion. [App'x at A68–A71.] The Secretary declined to review the Board's decision. [App'x at A67.] Adventist then filed a complaint in the district court seeking review of the agency's decision under the Administrative Procedures Act. [*Adventist Health System/Sunbelt, Inc. v. Sebelius*, 2:10-cv-189 (E.D. Tenn. Aug. 31, 2010), Complaint at DE 1.] The district court adopted the recommendation of the magistrate judge with respect to the parties' cross-motions for summary judgment, concluding that § 1315 provided the Secretary the discretion to exclude expansion waiver patient days from the DSH calculation, and dismissed the case. [*Id.*, Order and Judgment at DE 28–29 (June 13, 2011).] This appeal followed. [*Id.*, Notice of Appeal at DE 31 (Aug. 10, 2011).]

**II.**

"When reviewing an administrative agency's final decision under the [Administrative Procedures Act], we review the district court's summary judgment decision *de novo*, while applying the 'appropriate standard of review' to the agency's decision." *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408 (6th Cir. 2007) (quoting *Fligiel v. Samson*, 440 F.3d 747, 750 (6th Cir. 2006)).

Here, we consider the Secretary's decision to exclude expansion waiver patient days from the DSH adjustment calculation in light of the federal statute and, thus, must first explore "whether Congress has directly spoken to the precise question at issue" in the law as promulgated. *Estate of Gerson v. Comm'r of Internal Revenue*, 507 F.3d 435, 438 (6th Cir. 2007) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); citing *Jewish Hosp.*, 19 F.3d at 273). "When it has, we apply the plain language of the statute." *Id.* (*citing Chevron*, 467 U.S. at 842–43). "If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

If we determine, however, that Congress has not directly addressed the precise question at issue and that the statute is silent or ambiguous on the specific issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. Because "[t]he judiciary is the final authority on issues of statutory construction[, we] must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. In assessing whether the agency's construction is permissible, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Id*. at 843 n.11. Rather, the agency's construction is entitled to deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

### III.

As a threshold matter, we conclude that the law prior to the enactment of the DRA did not directly address how those beneficiaries of state expansion waiver plans approved by the Secretary under subchapter XI—individuals who were not eligible for Medicaid plans approved by the Secretary under subchapter XIX—should have been counted, if at all, in the DSH adjustment calculation. Further, the Secretary's answer to the question of how to count expansion waiver patients during the period in question— characterizing demonstration project expenditures as subchapter XIX expenditures for purposes of reimbursement but not for purposes of the DSH adjustment calculation—was a permissible construction of the statute and neither "arbitrary, capricious, [n]or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. Therefore, we will affirm the district court's decision as more fully set forth below.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), as it read during the relevant period, provided that the numerator to be included in the DSH adjustment calculation is "the number of the hospital's patient days . . . which consist of patients who (for such days)

were eligible for medical assistance under a State plan approved under subchapter XIX [Medicaid]." Adventist insists that, when § 1395ww(d)(5)(F)(vi)(II) is read together with 42 U.S.C. § 1315(a)(2)(A), as then in force, the plain language of the statute required the Secretary to include as patient days in the DSH adjustment calculation those attributable to the population of patients whose costs were reimbursed as part of a state expansion waiver plan. We disagree.

By its plain language, § 1395ww(d)(5)(F)(vi)(II) did not require the Secretary to include patient days for expansion waiver patients in the DSH adjustment calculation. State expansion waiver plans, including Tenncare, were approved by the Secretary pursuant to authority provided under subchapter XI, not subchapter XIX of the Medicaid statute. *See* 42 U.S.C. § 1315. Section 1315(a)(2)(A) recognized this distinction, providing that the costs of any demonstration project approved by the Secretary under subchapter XI, "which would not otherwise be included as expenditures under [the various provisions of subchapter XIX, among others], as the case may be, and. . .shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under such subchapter, . . . as may be appropriate." More to the point, there would be no reason to "regard" these costs as expenditures under subchapter XIX if they were, in fact, expenditures made pursuant to state plans approved under subchapter XIX, 42 U.S.C. § 1396–1396v. Thus, for the period in question, § 1395ww(d)(5)(F)(vi)(II) was silent as to the treatment of expansion waiver patients.

Nor, when § 1395ww(d)(5)(F)(vi)(II) is read together with § 1315(a)(2)(A), can we conclude that the language of the statute was as clear as the Ninth Circuit found it to be in *Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091 (9th Cir. 2005), upon which Adventist relies. In *Portland Adventist,* the Ninth Circuit held that § 1315, as it read prior to the enactment of the DRA, provided the Secretary with no discretion to "characterize demonstration project expenditures as [subchapter] XIX expenditures for purposes of Medicaid reimbursement but not for purposes of the DSH [adjustment] calculation." *Id.* at 1097. We find, however, that the Medicaid statute, as it read then,

was ambiguous when it came to the treatment of expansion waiver populations. Ultimately, we agree with the more recent decision of the D.C. Circuit that while 42 U.S.C. § 1315(a)(2)(A) "[g]ave the secretary control over the duration of the demonstration project, the [statute's] language may do more. Plausibly, the 'to the extent' language is a grant of discretion to the Secretary to determine which costs or how much of the costs are to be treated as expenditures." *Cookeville Reg'l Med'l Ctr.*, 531 F.3d at 848.

To be fair, both the Court of Appeals for the D.C. Circuit and this Court have had the benefit of considering the issue in light of the DRA, which was enacted after *Portland Adventist* was decided. With the enactment of the DRA, Congress amended the statute to directly state that the Secretary "may" include expansion waiver patient days in the DSH adjustment calculation and ratified the Secretary's policy of and exercise of discretion with respect to how to count expansion waiver patient days in the DSH adjustment calculation for periods between the date of the promulgation of the Interim Final Rule, January 20, 2000, and the enactment of the DRA. Deficit Reduction Act, § 5002(b)(3)(A); *Cookeville Reg. Med. Ctr*, 531 F.3d at 849. We give this Congressional statement clarifying the intent of the DSH adjustment calculation provision and the scope of the Secretary's discretion significant consideration and afford it great weight. *See Estate of McCoy v. Comm'r of Internal Revenue*, 809 F.2d 333, 338 (6th Cir. 1987) (holding that subsequent legislation declaring the intent of an earlier statute is entitled to significant consideration and that when amendment is adopted to clarify rather than change the meaning of earlier legislation it should be accorded even greater weight). In light of the DRA, we are further persuaded that the Secretary's answer to the question of how to count expansion waiver participants in the DSH adjustment calculation—excluding patient days for expansion waiver population patients from the DSH adjustment calculation—was a permissible construction of the statute.

Since the DRA clarified rather than changed the law, there is no issue of retroactivity as Adventist insists. Nor can we conclude, as Adventist urges, that the Secretary was bound to reimburse providers like Adventist because of an earlier, express

determination requiring fiscal intermediaries to count expansion waiver patient days in the DSH adjustment calculation upon which it and other hospitals should have been able to rely. Rather, the facts show that, as early as October 1996, the agency was instructing Tennessee hospitals that expansion waiver patient days were to be excluded from the DSH adjustment calculation. *See* [Addendum to Appellee's Brief at 57;] 42 C.F.R. § 412.106(b)(4) (1996). We see no evidence that Adventist acted under the misapprehension that it would be reimbursed by means of the DSH adjustment calculation for patient days attributable to Tenncare expansion waiver patients whose participation were approved under a plan approved under subchapter XI, not subchapter XIX, and we will not consider this argument further.

**IV.**

For the reasons stated above, we **AFFIRM** the judgment of the district court.