**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2627
_____


NAZARETH HOSPITAL; ST. AGNES MEDICAL
CENTER

v.

SECRETARY UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

                                        Appellant

_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.:  2-10-cv-03513)
District Judge:  Honorable Edmund V. Ludwig

_____


Argued on January 16, 2014


Before: RENDELL, ROTH and BARRY, <u>Circuit Judges</u>

(Opinion filed:  April 2, 2014)

Veronica J. Finkelstein, Esquire
Joel M. Sweet, Esquire
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106

Stuart F. Delery, Esquire
Assistant Attorney General
Zane David Memeger, Esquire
United States Attorney
Anthony J. Steinmeyer, Esquire
Joshua Waldman, Esquire  **(Argued)**
Attorneys, Appellate Staff
United States Department of Justice
Civil Division, Room 7232
950 Pennsylvania Ave., N.W.
Washington, D.C.   20530

                    Counsel for Appellant


Mark H. Gallant, Esquire  **(Argued)**
Gregory M. Fliszar, Esquire
Katie Beran, Esquire
Robert A. Chu, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA   19103

2

---

O P I N I O N

---

**RENDELL**, Circuit Judge:

Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("HHS"), has appealed from the District Court's judgment holding the Secretary's Medicare regulation to be arbitrary and capricious, as well as a violation of the Equal Protection Clause. The dispute centers around certain Medicare reimbursement adjustments to appellees, two Pennsylvania hospitals. The District Court found there was no rational basis to exclude from such reimbursements patients covered by Pennsylvania's General Assistance ("GA") plan, while at the same time including patients covered under a federal statutory waiver program. For the reasons that follow, we will reverse the judgment of the District Court.

## I. **Background**

A. Medicare and Medicaid

Medicare, the federal health insurance program for older and disabled individuals, reimburses hospitals for specified inpatient services based upon a "prospective system." 42 U.S.C. § 1395ww. Under this system, payments are predicated upon prevailing rates for given services, rather

3

than retrospectively based on a hospital's actual costs. *Id.* at § 1395ww(d). The statute provides for certain adjustments to prospective reimbursement rates, such as for different wage levels, hospitals with medical education, and sole community hospitals. *Id.* at §§ 1395ww(d)(3)-(d)(5).

Another adjustment provided for by the statute is for "disproportionate share hospitals" ("DSH"), hospitals that serve high numbers of low-income patients. Whether a hospital is eligible for a Medicare DSH adjustment depends in part on the number of days during which the hospital treats certain low-income patients, also known as "patient days." The relevant language of the subsection concerning calculation of Medicare DSH adjustments is as follows:

> (II) . . . the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [Medicaid] . . .
>
> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, the Secretary may, to the extent and for the period the

4

> Secretary determines appropriate, *include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI of this chapter.*

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). In plain English, the Medicare DSH formula takes into account the number of patient days for those patients eligible for Medicaid, and may also include patient days for those patients ineligible for Medicaid, but who received benefits under a Medicaid "demonstration project."

Pursuant to the Medicaid Act, individual states submit a medical assistance plan which provides coverage to certain classes of indigent individuals, which we will call a "State Plan." 42 U.S.C. § 1396a(a). A State Plan must conform to certain statutory eligibility requirements, but the law also provides states flexibility regarding some of the categories of individuals to be covered, and the medical care and services that they can receive. *Id.*; *see Cooper Univ. Hosp. v. Sebelius*, 686 F. Supp. 2d 483, 486 (D.N.J. 2009) *aff'd*, 636 F.3d 44 (3d Cir. 2010). Once a plan is approved by the Secretary, the state can receive certain reimbursements from the federal government based on amounts expended as medical assistance under the State Plan, that is, those amounts expended covering individuals eligible for Medicaid. *See Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1031 (9th Cir. 2011).

As noted above in the Medicare DSH provision cited, the Secretary is empowered to waive statutory requirements pertaining to federal entitlement programs such as Medicaid and "regard" patients as eligible for Medicaid if they are treated under an experimental, pilot or demonstration project under 42 U.S.C. § 1315. Thus, Medicare DSH adjustments take into account both the patient days that a hospital has treated patients eligible for Medicaid, and days for those patients ineligible for Medicaid but who receive benefits pursuant to a Medicaid demonstration project. To authorize such a project, known as a Section 1115 waiver project,[1] the Secretary must conclude that the state-submitted proposal "is likely to assist in promoting the objectives of" Medicaid. 42 U.S.C. § 1315(a). In addition, the Secretary has discretion to choose which Medicaid requirements will be waived, how long the waiver lasts, and whether the costs of the project will be considered Medicaid-covered expenditures. *Id.* at §§ 1315(a)(1)-(a)(2). The Secretary must also conclude that the project will be budget-neutral. *Id.* at § 1315(e)(6). Waivers are not inherently provided for in State Plans; rather, states must submit specific applications for Section 1115 waiver projects.

B. Evolution of the Medicare DSH Formula

Initially, for purposes of calculating DSH adjustments, the Medicare statute counted simply the "number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A . . . ." 42 C.F.R. § 412.106(b)(4). Patients were considered

---

[1] This name originated because such waiver authority was promulgated in § 1115 in Title XI of the Social Security Act.

eligible for Medicaid if they were eligible for inpatient hospital services under an approved State Medicaid Plan. "Although the Secretary administers DSH payments, it is a fiscal intermediary, typically a health insurance company authorized to act on the Secretary's behalf, who reviews the hospital's end-of-year cost reports." *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1223 (9th Cir. 2010). The Medicare DSH formula was regarded by intermediaries, at least in some states, as including days covered under state GA and charity care programs. In brief, GA programs generally provide reimbursement to hospitals for care of individuals who are low-income as defined by a given state, but not eligible for Medicaid. *Id.* It seems that through the 1990s, intermediaries in Pennsylvania included GA patient days in the Medicare DSH formula. (Appellees' Br. at 7.)

However, "[i]n light of . . . discrepancies between the practices of fiscal intermediaries in the various states," in December 1999 the Centers for Medicare and Medicaid Services ("CMS") clarified that the Medicare DSH formula only permitted the inclusion of patient days wherein the patients were eligible for Medicaid, excluding state general assistance and charity plan patient days going forward. *See Adventist Health Sys./Sunbelt, Inc. v. Sebelius*, 715 F.3d 157, 161 (6th Cir. 2013); (App. 568-73). In January 2000, the Secretary issued a Final Interim Rule, stating that: "hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act." 42 C.F.R. § 412.106(b)(4)(ii). Thus, while GA patient days remained excluded, hospitals could now count patient days for individuals covered under a Section 1115 waiver project toward their Medicare DSH adjustment.

During the subsequent notice and comment period, several comments were submitted to the Secretary claiming that the inclusion of days under a Section 1115 waiver was unfair to those hospitals that did not operate under such a waiver, but rather treated patients eligible only under state GA plans. The Secretary agreed that while the regulation "does advantage States that have a section 1115 expansion waiver in place, these days are considered to be Title XIX days by Medicaid standards." Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 FR 47054-01, 47087, Aug. 1, 2000. The Secretary went further:

> General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program. Charity care days are those days that are utilized by patients who cannot afford to pay and whose care is not covered or paid by any health insurance program. While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid-eligible under the State plan and are not considered Title XIX beneficiaries. Therefore, Pennsylvania, and

8

> other States that have erroneously included these days in the Medicare disproportionate share adjustment calculation in the past, will be precluded from including such days in the future.

(App. 65-66.) As such, the Final Rule, issued in August 2000, stated that Section 1115 waiver patient days could be included in Medicare DSH calculations, while GA patient days remained excluded.

Subsequently, Congress passed the Deficit Reduction Act of 2005 ("DRA"). That law amended the statutory Medicare DSH provision to state explicitly that patient days would be counted for those patients eligible for Medicaid, and "the Secretary may . . . include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI of this chapter [Medicaid]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). In addition, the DRA "ratified, effective as of the date of their respective promulgations," certain regulations which "provide for the treatment of individuals eligible for medical assistance under a demonstration project . . . ." Pub. L. No. 109-171, § 5002(b). Specifically listed as one of the ratified regulations was the January 2000 Interim Final Rule, which stated that Section 1115 waiver patient days were to be included in Medicare DSH calculations. *Id.*

C. State General Assistance Plan

9

After the promulgation of the Final Rule, but before the enactment of the DRA, appellees Nazareth Hospital and St. Agnes Medical Center, both Pennsylvania hospitals, included GA patient days in their 2002 Medicare cost reports "under protest." (Appellees' Br. at 11); (App. 121.) Notably, Pennsylvania has not applied for a Section 1115 waiver, and instead provides reimbursements to certain hospitals as a component of the state GA program. That GA program reimburses hospitals and provides cash assistance for patients who are ineligible for Medicaid, but are nonetheless classified as low-income or otherwise needy by the state. (App. 121.) Appellees note that, while ostensibly state-run, the GA program was described in Pennsylvania's State Medicaid Plan, specifically in amendment SPA 94-08, as a part of the state's proposal to distribute certain lump-sum payments, known as Medicaid DSH payments. 42 U.S.C. § 1396r-4.

Such payments, which are distinguished from Medicare DSH adjustments that are the subject of this appeal, can be distributed at the state's discretion, so long as they are distributed to institutions that provide care to "low-income" individuals, as defined by the state itself. *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1035 (describing the different payment mechanisms). States often describe in their state Medicaid plan relevant state charity or general assistance plans, so that hospitals which treat patients under such plans can receive Medicaid DSH payments. *See Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 179 (D.C. Cir. 2008).[2]

---

[2] A helpful way of contrasting these DSH provisions is that both Medicare and Medicaid reimburse hospitals, or adjust rates of reimbursement, for the treatment of low-income individuals. *Medicare* DSH adjustments use Medicaid-

Accordingly, Pennsylvania amended its state Medicaid plan via amendment SPA 94-08 to provide:

> additional payments to meet the needs of those facilities which serve a large number of Medicaid and medical assistance eligible, low income patients. . . . These payments are available to hospitals on behalf of certain low-income persons who are described below and are made in addition to, and not as a substitute for, disproportionate share payments described in other portions of this state plan.

(App. 595.) Amendment SPA 94-08 further stated that those "low-income persons" were those who were covered under the state GA program. (App. 595.) As such, SPA 94-08

---

eligibility and Section 1115 waiver projects as a proxy for determining low-income status. By contrast, *Medicaid* DSH payments use eligibility either under Medicaid and under the state's definition of low income, to determine economic status. *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1036 (noting that the "Medicaid DSH proxy considers *either* those patients who are [eligible for Medicaid] *or* who qualify under the statute's definition of 'low income'"); 42 U.S.C. § 1396r-4(b)(3) (defining "low-income utilization rate" under Medicaid DSH in part as including state charity care patients).

11

established that Medicaid DSH payments were to be used by Pennsylvania, in part, to reimburse hospitals for care of GA patients.

### D. Procedural History

Following appellees' "protest" inclusion of GA patient days on their 2002 Medicare cost reports, the Intermediary excluded those days from the hospitals' Medicare DSH calculations. That decision was affirmed by both the appellate Provider Reimbursement Review Board and the CMS Administrator. The hospitals appealed the ruling of the Administrator to the U.S. District Court for the Eastern District of Pennsylvania, on the grounds that (1) excluding GA days was an impermissible construction of the Medicare statute by the Secretary, (2) excluding GA patient days while including Section 1115 waiver days was arbitrary and capricious under the Administrative Procedure Act, and (3) such disparate treatment constituted an Equal Protection violation.

The case was initially held in suspense pending the appeal in *Cooper University Hospital v. Sebelius*, 686 F.Supp. 2d 483 (D.N.J. 2009). That case concerned whether patient days covered under the New Jersey Charity Care Program should be included in Medicare DSH calculations. *Id.* at 484. The district court held that while the statute was ambiguous, the Secretary permissibly construed the law to exclude charity care patient days from the Medicare DSH formula. *Id.* at 498. We agreed with this reasoning and affirmed in a precedential opinion, "substantially for the reasons set forth" by the district court, noting that "[w]e could not do it better . . . ."

12

*Cooper Univ. Hosp. v. Sebelius*, 636 F.3d 44, 45 (3d Cir. 2010).

Following that ruling, the parties in this case filed cross-motions for summary judgment in the District Court, with the appellees limiting their arguments to whether the disparate treatment of GA and Section 1115 patient days constituted arbitrary and capricious action under the APA, or a violation of Equal Protection. The District Court initially remanded the case to the agency to make a more complete record regarding the distinction between GA patient days and Section 1115 days. The agency responded at length, answering inquiries posed by the District Court, such as that regarding the similarity between hospital patient populations covered under the GA plan and those in other states covered under Section 1115 demonstration projects. In one relevant passage, the Secretary noted:

> The eligibility criteria for the individual State section 1115 populations are federally approved and set forth in the terms and conditions of the section 1115 waiver project. Unlike the State general assistance program, the section 1115 waiver has been reviewed and approved by the Federal government as likely to assist in promoting the objectives of Medicaid. No such Federal determination has been made with respect to a State-only program.

13

> In addition, the expenditures under the section 1115 waiver must be budget neutral. The Medicaid expenditures under the waiver cannot exceed the expenditures that would have otherwise been spent under the Medicaid state plan. The State only funded program has no such restrictions.

(App. 75-76.) The Secretary concluded, in essence, that she had acted rationally in including patient days for those patients eligible for traditional Medicaid, as well as those days, "related to the Federally approved and authorized section 1115 waiver populations for whom expenditures for care is considered to be an approved expenditure under Title XIX." (App. 83.) As such, the Secretary held, because Pennsylvania GA patients did not fall under either category, it was reasonable to exclude them from Medicare DSH calculations.

The District Court disagreed. It held that there was no rational distinction between the state GA program and several Section 1115 waiver projects, in terms of eligibility requirements and services covered. The Court further determined that, just as in approving a Section 1115 waiver, CMS "determined that the objectives of the Medicaid statute were promoted by authorizing" SPA 94-08. (App. 37.) The District Court concluded that the Secretary's disparate treatment could not stand under both the APA and the Equal Protection Clause. As a consequence, the Court ordered the

14

Secretary to remit certain Medicare DSH adjustments to plaintiffs, including patient days under the state GA program.

## II. <u>Standard of Review</u>

We have jurisdiction over this appeal under 28 U.S.C. § 1291. "We apply *de novo* review to a district court's grant of summary judgment in a case brought under the APA, and in turn apply the applicable standard of review to the underlying agency decision." *Pennsylvania, Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 146 (3d Cir. 2012) (internal quotations omitted). Pursuant to the APA, courts must set aside agency action which is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," or which is conducted, "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A) & (D).

"Under what we have called this 'narrow' standard of review, we insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)). "Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. If [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (internal quotations and citations omitted).

Review of an equal protection claim in the context of agency action is similar to that under the APA. That is, an agency's decision must be upheld if under the Equal Protection Clause, it can show a "rational basis" for its decision. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). As such, "the equal protection argument can be folded into the APA argument, since no suspect class is involved and the only question is whether the . . . treatment of [appellees] was rational (i.e., not arbitrary and capricious)." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011). Taken together, we need only consider whether the Secretary set forth a satisfactory, rational explanation for her actions here. *See New Jersey Hosp. Ass'n v. Waldman*, 73 F.3d 509, 517 (3d Cir. 1995) (finding that arbitrary and capricious review also governed by whether state can show rational basis).

## III. Discussion

Our review of the record establishes that the Secretary set forth multiple rational bases upon which to distinguish patient days covered under Pennsylvania's GA program, from days covered under a Section 1115 waiver project. We first explain that the Secretary has the statutory authority to treat those two categories of patient days differently from each other. Further, we conclude that, given the different purposes of the programs, and the extent of federal control over them, it was neither arbitrary nor capricious to do so.

A. Statutory Distinction

16

Appellees did not claim below, and do not now contend, that the Secretary lacked statutory authority to either include Section 1115 patient days, or exclude state GA days from Medicare DSH calculations. While the language of the relevant statutory provision obviously does not determine whether the Secretary acted in an arbitrary and capricious manner, we think it a relevant starting point in our analysis, as the statute is at the root of the distinction between the two types of patient days at issue.

The statutory subsection, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), mandates that Medicare DSH adjustments are keyed to the number of Medicaid-eligible patient days, adding that the Secretary may also choose to include days for patients eligible under a Section 1115 project. Appellees point out that the latter subsection, providing discretion to include Section 1115 patient days, was passed as part of the DRA in 2005, whereas the regulation at issue was finalized in 2000. Therefore, appellees claim, the statute must be evaluated as it stood in 2000, lacking any mention of Section 1115 waiver projects.

We note, however, that the DRA explicitly "ratified, effective as of the date of" its promulgation, the January 2000 Interim Final Rule, as it pertained to Section 1115 waiver projects. Pub. L. No. 109-171 §§ 5002(b)(1), (b)(3)(A), (B). "It follows that there is no problem of retroactivity. The Deficit Reduction Act did not retroactively alter settled law; it simply clarified an ambiguity in the existing legislation." *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008). Accordingly, there can be no dispute that, at the very least, the Secretary had discretion to include

17

Section 1115 patient days in the Medicare DSH adjustment, as of the date of the Interim Final Rule in January 2000.

In addition, circuit courts have held that it is a permissible, or even necessary, construction of the statute to *exclude* state charity or GA plan patient days from Medicare DSH calculations. In *Adena Regional Medical Center v. Leavitt*, 527 F.3d 176 (D.C. Cir. 2008), the D.C. Circuit held that Ohio's charity care patient days could not be included in the Medicare DSH calculation, on the view that the Medicare statute specifically excluded such patient days. Similarly, in *University of Washington Medical Center*, 634 F.3d 1029, the Ninth Circuit found that the statute required the Secretary to exclude from Medicare DSH calculations days for those patients who were not eligible for Medicaid but nonetheless covered under Washington's state plan. *See also Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d at 1227 (finding that exclusion from Medicare DSH formula of patient populations not covered by Arizona's Section 1115 waiver was "not contrary to law, arbitrary or capricious, or unsupported by substantial evidence").

In *Cooper*, we affirmed that it was permissible for the Secretary to exclude New Jersey charity plan[3] patient days

---

[3] Appellees note that certain of these cases dealt with charity care patient days, as opposed to those covered under a general assistance plan such as that in place in Pennsylvania. We find that this is a distinction without a difference, as the Secretary made clear both in the December 1999 clarification and in the Final Rule in August 2000 that both charity care and general assistance patient days would be excluded from Medicare DSH calculations. (App. 65-66, 572.)

from Medicare DSH adjustments. The district court correctly noted that the DRA "suggest[ed] Congress' intent to narrowly apply the Medicaid proxy fraction," in ratifying the discretionary inclusion only of Section 1115 waiver patient days. *Cooper*, 686 F. Supp. 2d at 494.[4]

In sum, the Secretary had discretion to include Section 1115 patient days in Medicare DSH adjustments, pursuant to congressional ratification, and could exclude state charity or general assistance days. The Government must now establish that, in taking both such actions, the Secretary articulated a rational basis for doing so.

B. Distinction in Purpose

The Government argues that the very purpose of a Section 1115 waiver project rationally distinguishes it from Pennsylvania's GA plan. (Gov. Br. at 49.) That is, a Section 1115 waiver project is an experimental, demonstration or pilot project which is only approved if the Secretary concludes that it "is likely to assist in promoting the objectives of" Medicaid. 42 U.S.C. § 1315(a). As CMS explained on remand:

> The purpose of these [Section 1115] demonstrations, which give States additional flexibility to design and improve their programs, is to demonstrate and evaluate policy approaches such

---

[4] *Cooper*, *Adena*, and *Phoenix Memorial*, each concerned reimbursement disputes that pre-dated the enactment of the DRA in 2005.

as: expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible; providing services not typically covered by Medicaid; using innovative service delivery systems that improve care, increase efficiency, and reduce costs.

(App. 55.) In fact, a Section 1115 waiver project can be vacated if a court finds that the Secretary could not have rationally found the program likely to advance the objectives of Medicaid. *See Newton-Nations v. Betlach*, 660 F.3d 370, 381 (9th Cir. 2011) (vacating Medicaid waiver due to insufficient evidence that the Secretary "'consider[ed] the impact of the state's project on' the persons the Medicaid Act 'was enacted to protect'") (quoting *Beno v. Shalala*, 30 F.3d 1057, 1070 (9th Cir. 1994)); *C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 185 (3d Cir. 1996) (reviewing similar waiver project under Aid to Families with Dependent Children program). By contrast, rather than a demonstration project, the Pennsylvania GA plan constitutes the permanent state medical assistance program, and requires no federal judgment that it is likely to assist in promoting the goals of Medicaid.

However, the District Court and appellees reject this distinction. The District Court found, and appellees urge here, that the Secretary approves a Section 1115 waiver project just as she does Pennsylvania's GA program – specifically amendment SPA 94-08 – which is included as part of the state Medicaid plan. This finding was in error.

20

While the Secretary must find that a Section 1115 waiver project is likely to assist in promoting the objectives of Medicaid, she reviewed SPA 94-08 for an entirely different reason. Under the Medicaid DSH statute, state Medicaid plans "require[] [DSH] payments to hospitals to take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs." 42 U.S.C. § 1396r-4(a)(1). That provision requires a state to submit an amendment to its Medicaid plan that "specifically defines" eligibility for Medicaid DSH payments, and "provides . . . for an appropriate increase in the rate or amount of payment for such services provided by such hospitals . . . . " *Id.* at § 1396r-4(a)(1)(A)-(B). In addition, states are required to submit a "description of the methodology used by the State to identify and to make payments to disproportionate share hospitals . . . on the basis of the proportion of low-income and [M]edicaid patients . . . . " *Id.* at § 1396r-4(a)(2)(D).

Thus, the Secretary did not "determine[] that the objectives of the Medicaid statute were promoted by authorizing" SPA 94-08, as the District Court held. (App. 37.) Rather, the Secretary reviewed SPA 94-08 simply to ascertain how Pennsylvania intended to disburse Medicaid DSH payments. *See Adena*, 527 F.3d at 179 ("Federal law obliged Ohio to submit the [amendment to its State Medicaid Plan] to the Secretary for approval because the mechanism for providing a DSH adjustment under Medicaid is part of Ohio's Medicaid plan, and the Secretary must approve that plan."). A Section 1115 waiver is therefore distinct from SPA 94-08, in that it serves a different purpose, and provides the Secretary greater control and oversight.

21

Importantly, CMS noted this precise distinction upon remand, stating that, "[u]nlike the State general assistance program, the section 1115 waiver has been reviewed and approved by the Federal government as likely to assist in promoting the objectives of Medicaid. No such Federal determination has been made with respect to a State-only program." [5] (App. 75-76); *see also* (App. 82) (noting that Delaware's Section 1115 waiver project "was required to . . . be approved by CMS as consistent with the objectives of Medicaid in order to be treated as Medicaid expenditures for the costs of individual care. That process did not occur under a section 1115 waiver approval for the general assistance state days involved in this case.").

We agree with the Government that these distinct purposes "rationally separate Section 1115 demonstration projects from Pennsylvania's GA program." (Gov. Br. at 44.) Given this "relevant distinction," the Secretary was not treating "similar situations differently," by including patient days covered under a demonstration, experimental or pilot program approved to advance the objectives of Medicaid, but excluding patient days under a state program that lacked any such purpose. *See Muwekma Ohlone Tribe*, 708 F.3d at 216.

---

[5] It is of no consequence that this reasoning was mapped out on remand, rather than during the initial promulgation of the Final Rule in 2000. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("Needless to say, if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives.").

C. Distinction in Control

The Government also argues that the degree of federal control over Section 1115 waiver projects distinguishes them from Pennsylvania's GA program. That is, if the Secretary determines that an experimental waiver project is likely to advance the goals of Medicaid, she has significant authority to determine the precise scope of the project. The Secretary may determine which Medicaid requirements will be waived, how long the waiver will last,[6] and whether the costs of the project will be considered Medicaid expenses eligible for matching payments under the statute. 42 U.S.C. §§ 1315(a)(1)-(a)(2); *see Pharm. Research & Mfrs. of Am. v. Thompson*, 313 F.3d 600, 602 (D.C. Cir. 2002) ("The Secretary also has authority to 'regard' costs for a demonstration project as an 'expenditure' pursuant to that state's Medicaid plan.").

The Secretary has no analogous authority to alter the scope of a state GA program, even if referenced in the state Medicaid plan, as in the case of SPA 94-08. As noted above, the Secretary reviews such amendments for compliance with requirements pertaining to Medicaid DSH payments. 42 U.S.C. §§ 1396r-4(a)(1)(A)-(B).

On remand, CMS also noted this distinction as grounds for differentiating Section 1115 waiver programs from Pennsylvania's GA plan. It noted that, unlike a state general assistance program, "[t]he eligibility criteria for the individual

---

[6] "In general," CMS noted, "§ 1115 demonstrations are approved for a five-year period and can be renewed, typically for an additional three years." (App. 55.)

State section 1115 populations are federally approved and set forth in the terms and conditions of the section 1115 waiver project." (App. 75-76); *see also* (App. 77) (finding that any comparison between GA and Section 1115 waiver populations "can at best be only speculative," as Pennsylvania had not submitted its GA plan for approval as a Section 1115 waiver project.) Again, we find that such a distinction establishes a rational basis for the Secretary to treat Pennsylvania's GA patient days differently from days covered under a Section 1115 waiver project.

Like the Secretary in promulgating the regulations at issue, we recognize that such differentiation may disadvantage hospitals such as appellees, that do not operate in a state with an ongoing waiver project. However, this occurred because of permissible, rational choices made by the Secretary. She reasonably chose to include in Medicare DSH calculations patient days which were covered under a waiver program that she had specifically found would advance the objectives of Medicaid, and over which she had authority to initially shape the project's scope. She further determined that state general assistance days, which shared none of these characteristics, would not be so included. Such actions were neither arbitrary or capricious under the APA, nor a violation of equal protection. Moreover, nothing prevents Pennsylvania from filing an application to qualify for a Section 1115 waiver.

D. Similarity in Population and Plans

The District Court focused on appellees' claim that patients and services covered under Section 1115 waiver projects are the same as those covered by Pennsylvania's GA

plan. As the District Court stated, "[n]either the inpatients nor the hospital services made available under SPA 94-08 in contrast to Section 1115 waiver programs differ significantly – except as to the hospital's statutory path to federal matching funds." (App. 35.) It concluded, "[o]n this record, plaintiff hospitals in all relevant respects are indistinguishable from other hospitals in Section 1115 waiver states." (App. 45.)

It is sufficient to state that even if such alleged similarities are accurate, they are irrelevant. While people and services may be the same, they can be treated differently for purposes of reimbursement if the reason for the differing treatment is rational. The Secretary has described relevant distinctions between patient days under the state GA plan and those under a Section 1115 waiver project, such that she rationally excluded the former from Medicare DSH calculations and included the latter.

We reach the same conclusion with regard to the District Court's holding that the Secretary erroneously found that Pennsylvania's GA program was "state-only funded." Appellees argue that because Medicaid DSH payments are used to subsidize GA program care, the state plan is federally funded, and thus identical to traditional Medicaid payments. (Appellees' Br. at 34.) They accordingly take issue with CMS's repeated description of the GA program as state-only funded.

First, we note Nazareth Hospital's own stipulation: "General Assistance Days represent patient days of Pennsylvania Medical Assistance beneficiaries enrolled in the 'State-Only funded' General Assistance Program." (App.

25

121.)  We will not fault the Administrator for adopting the hospital's agreed-upon terminology.[7]

Second, we reiterate that whether there is similarity in patient populations or funding provided is immaterial, as differing treatment between the GA program and Section 1115 waiver projects need only be justified by a rational basis advanced by the agency.  As shown above, (1) the purpose of Section 1115 waiver projects and (2) their accompanying conditions under federal control, reasonably distinguish such projects from Pennsylvania's GA program, and were set forth as rational bases for differing treatment by the Secretary.[8]

---

[7] The Government also takes pains to point out that Pennsylvania indeed utilizes Medicaid DSH payments to subsidize its state GA plan, but that the lump-sum allotment is capped by statute and is not providing matching payments for any specific patient or services.  We agree that any funding of GA services with federal dollars is thus purely a choice of Pennsylvania and cannot alone convert the GA plan, a creature of state law, into one of federal law.  *See Univ. of Wash. Med. Cntr. v. Sebelius*, 634 F.3d at 1035  ("[T]he federal government was not spending its funds for the GAU and MI populations' care. . . .  Regardless of how the State chooses to distribute it to DSH hospitals, this money is *not* being paid on behalf of any specific individual for any specific service.").

[8] We accordingly reject appellees' alternate argument that, in describing the GA program as state-only funded, the Secretary's decision was not supported by substantial evidence under 5 U.S.C. § 706(2)(E), or was otherwise contrary to the record.

### E. Rulemaking Comments

Appellees alternatively contend that the Secretary's decision should be reversed because she ignored comments made in the rulemaking process, pursuant to 5 U.S.C. § 553(c). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, and respond to 'relevant' and 'significant' public comments. However, neither requirement is particularly demanding." *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (citations omitted).

While the District Court did not address this issue, we conclude that the Secretary adequately responded to the comments posed during the rulemaking process, which claimed that patient days under a General Assistance plan should be treated identically to Section 1115 waiver days. The Secretary noted that "comments from Pennsylvania hospitals supported the continued inclusion of general assistance days in the Medicaid portion of the Medicare DSH adjustment calculation as well as expansion waiver days." (App. 65.) The Secretary then responded in part:

> [w]hile we initially determined that States under a Medicaid expansion waiver could not include those expansion waiver days as part of the Medicare DSH adjustment calculation, we have since consulted extensively with Medicaid staff and have determined that section 1115 expansion waiver days are utilized

> by patients whose care is considered to be an approved expenditure under Title XIX. While this does advantage States that have a section 1115 expansion waiver in place, these days are considered to be Title XIX days by Medicaid standards.

(*Id.*) Together with the rest of the explanation, "this response demonstrates that the [agency] considered and rejected" the arguments of appellees, "this is all that the Administrative Procedure Act requires." *Covad Commc'ns Co. v. F.C.C.*, 450 F.3d 528, 550 (D.C. Cir. 2006) (internal quotations and brackets omitted) (quoting *City of Waukesha v. E.P.A.*, 320 F.3d 228, 258 (D.C. Cir. 2003)).

As an aside, it appears that the general remedy for failure to adequately respond to rulemaking comments is not complete vacatur of an agency rule, but rather remand for additional consideration. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (remanding to agency to "address . . . concerns" raised by comments that were "never really answered."). Here, the District Court initially remanded the case to the agency, requesting further explanation of the precise issues raised in the comments cited by appellees. We have found the agency's explanations on remand to be sufficient. Ignoring the record following remand and remanding for a second time for failure to address rulemaking comments, some thirteen years following the promulgation of the rule, would seem unwarranted at best. *See Covad Commc'ns Co.*, 450 F.3d at 550 ("The failure to respond to comments is significant only

insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.") (quoting *Thompson v. Clark,* 741 F.2d 401, 409 (D.C.Cir.1984)).

## IV. <u>Conclusion</u>

The Secretary set forth multiple rational bases justifying her including Section 1115 patient days in Medicare DSH calculations, but excluding days covered under Pennsylvania's GA plan. It is well-established that "a court is not to substitute its judgment for that of the agency," and should "uphold a decision . . . if the agency's path may reasonably be discerned . . . ." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Accordingly, the challenged regulations must stand. We reverse the decision of the District Court.